IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

\* \* \* \* \* \* \*

JOHN B. GOODRICH, d/b/a             CV 03-22-H-CCL
CHECKERBOARD CATTLE COMPANY,
and JOHN GRANDE d/b/a
GRANDE RANCH COMPANY,

      Plaintiffs,                       <u>OPINION & ORDER</u>

-v-

UNITED STATES FOREST SERVICE,
an agency of the U.S. Department
of Agriculture,

      Defendant.

\* \* \* \* \* \* \*

    Before the Court are the parties' cross-motions for summary

judgment.  The motions came on for hearing on December 6, 2005.

The Plaintiffs were represented by Hertha Lund, and the Federal

Defendants were represented by Mark Steger Smith.  Having heard

the parties' arguments and considered the briefs, affidavits, and

other exhibits presented by the parties, the Court is prepared to

rule.

I.   <u>Background</u>

Plaintiffs John Goodrich, d/b/a Checkerboard Cattle Company, and John Grande, d/b/a Grande Ranch Company, are two individuals and their respective ranching businesses.  Each Plaintiff holds a permit to graze cattle in the Castle Mountains Range of the Lewis and Clark National Forest ("LCNF").

The Amended Complaint filed by the Plaintiffs requires the Court to review a February 28, 1997, Record of Decision of the LCNF.  This Decision authorizes the LCNF to implement Alternative 10 in the Castle Mountains Range Analysis Final Environmental Impact Statement ("Final EIS or FEIS").  Alternative 10 results in a reduction of the number of cattle that each Plaintiff is permitted to graze within the Castle Mountains Range of the LCNF. During the past five years, both Plaintiffs have received Notices of Non-Compliance from the Forest Service regarding their utilization of their allotments.

The Castle Mountains Range is located in Meagher County, Montana.  The FEIS project area at issue in this case contains 70,000 acres of National Forest and 16,000 acres of private land.

(ROD 1.)   The project area contains the headwaters for the North and South Forks of both the Smith River and also the Musselshell River.  (ROD 1.)   Elevation ranges from approximately 5,000 feet to 8,500 feet.  (ROD 1.)   There are approximately 29,000 acres of grazing land within the Castle Mountains area.  (FEIS at III-9.) Prior to the ROD in 1997, approximately 19 local ranchers possessed grazing permits for approximately 2000 head of cattle on 15 grazing allotments[1] of National Forest.  (FEIS at II-11, III-9.)

The LCNF Forest Plan was adopted in June 1986.  AR A-10. The Forest Plan provides many goals for managing the forest:

- maintain soil productivity and minimize soil damage (Forest Plan 2-8, 2-29, 2-52);
- improve unsatisfactory range conditions and mitigate resource damage (Forest Plan 2-6, 2-39,2-40);
- continue or increase forage production for grazing (Forest Plan 2-2, 2-6, 3-23, 3-28, 3-30, 3-37);
- protect or enhance riparian habitat and wetland resource values (Forest Plan 2-2, 2-6, 2-39, 2-51, 3-88);
- promote high quality habitat and a high level of big

---

[1]  An "allotment" is a unit of management by the LCNF for grazing purposes.  A local rancher must have a permit to graze cattle on an LCNF grazing allotment.

game forage, meeting wildlife needs before livestock
increases to ensure a desired mixture of well-
distributed wildlife species and numbers (Forest Plan
at 2-2, 2-32, 3-37);

• protect fish and wildlife habitat in riparian areas
when developing allotment management plan (vis-a-vis
assignment of AUMs,[2] grazing season, and indicators of
time for removal of livestock) (Forest Plan 2-39).

Of the 15 grazing allotments in the Castle Mountains, only one
allotment had an Allotment Management Plan ("AMP") prepared in
the previous 10 years, meaning that virtually none of the AMPs
were prepared with the 1986 LCNF Forest Plan in mind.  (FEIS at
I-5 to I-6.)  The rest of the Castle Mountains allotments had
AMPs prepared in the previous 20 to 30 years (or not at all).
*Id.*

In 1988, two years after the LCNF Forest Plan was adopted, a
Range Audit conducted by the United States General Accounting
Office criticized the LCNF's grazing allotments in their lack of
compliance with the LCNF's Forest Plan.  In response, the LCNF

_____

[2]  "An 'AUM' is an 'Animal Unit Month,' or the amount of
forage eaten by a mature cow in one month."  *Nevada Land Action
Ass'n v. United States Forest Serv.*, 8 F.3d 713, 717 n. 4 (9th
Cir. 1993).

created a Range Task Force to bring the grazing allotments into compliance with the Forest Plan; the Range Task Force prioritized the LCNF's allotments for analysis, study, and planning.  (AR B-5 at 2; AR K-3.)  The Castle Mountains allotments were determined to be the LCNF's top priority for analysis, study, and planning.

In 1991, the LCNF began a range analysis of the Castle Mountains project area.  It inventoried 1,113 mapped polygons in the project area.  It clipped vegetation samples on 347 plots within the polygons.  The plant communities within the samples were thus surveyed and categorized.  The survey found that 20% of the uplands and 40% of the riparian areas in the grazing allotments were in low or medium quality ecological status.  (FEIS at I-5.)  Of the 43 miles of streams in the Castle Mountains, 35% were found to be in poor condition, and 45% of fish habitat was found to be in poor condition.  Overgrazing and stream-bank trampling by cattle was identified as one of the contributors to these poor conditions.  (FEIS I-6.)  Apparently, a dearth of water in the Castle Mountains project area caused cattle to overgraze near the riparian areas.

Prior to the undertaking of the range analysis survey, the local ranchers possessing grazing permits in the project area were notified that the purpose of the survey was to develop the data required for an environmental impact statement.  (ROD at 4.) The LCNF held meetings for the permittees to discuss the survey and later to discuss the results of its analysis.  (AR B-7, FEIS II-1.)  In 1993, through letters to 400 individuals and organizations, three open house meetings, and newspaper articles, the LCNF notified all interested parties in the project area that the EIS process was beginning.  (FEIS II-1; AR C-1.)  The DEIS was released in August, 1995.  (AR A-5.)  Alternative 4A was the preferred alternative.  The LCNF received 41 comments, including comments from the Plaintiffs or their representatives.  (FEIS S-3.)  After discussions with the permittees, and after the publication of the DEIS but before the publication of the FEIS, and in response to some of the comments, Alternative 10 was developed and then adopted as the preferred alternative in the FEIS.  (FEIS 2-5, II-30.)

The LCNF in its Record of Decision on February 28, 1997,

6

chose to undertake the action described in Alternative 10:

> The purpose and need of this decision is to move
> vegetation conditions toward a higher similarity to the
> potential natural community, improve hydrologic and
> fish habitat conditions, update Allotment Management
> Plans (AMPs) and identify needed range improvements.
> Alternative 10 is responsive to this purpose and need.
> This will be accomplished by changing grazing systems,
> reconfiguration of some allotments, establishing
> allowable use standards, reducing some animal unit
> months of grazing and completing range improvements
> such as water developments, fences and prescribed
> burns.  The enhancement of westslope cutthroat trout
> habitat was given high priority.

(ROD at 2.)  "Under Alternative 10, 110 cattle, or 1% of the

cattle of the Castle Mountain permittees would be affected

(reduced) and range improvements would cost [$194,000].  Four

permittees would have permitted number reductions from 2-5%.  One

permittee's permitted numbers would be reduced 6-10%."  (ROD 4.)

The ROD describes in a general fashion the changes that the 19

permittees would undergo on the 15 allotments:

> The reconfiguration includes: 1) combining the
> Sourdough Allotment and the Limestone and Thorsen's
> Pond pastures of the Flagstaff Allotment (West DU
> [Distribution Unit]) with the Checkerboard Allotment

7

(one permittee[3] with 108 AUMs will be moved to the
Whitetail Allotment in the Little Belt Mountains), 2)
combining the North DU of the Townsend Gulch Allotment
with the Pasture Gulch Allotment, 3) combining the Dry
Fork Pasture of the West DU with the East DU to form a
new Flagstaff Allotment, 4) removing private lands from
the Gorge Allotment (inholding would remain in the
allotment, but without any grazing permit), 5) fencing
off portions of private land and combining the
remainder of the Warm Springs Allotment with the
Alabaugh Allotment, 6) changing the National Forest
portion of the Field 46 and Townsend Gulch (South DU)
Allotments to special use authorizations, and 7)
Slaughterhouse distribution unit of the Blackhawk
Allotment will be removed from Blackhawk and made a
separate allotment.

(ROD at 7-8.)

    Plaintiff John Goodrich holds grazing permits on the

Whitetail, Cooper Creek, Lower Spring Creek, and Flagstaff

─────────────

    [3]  This point will become relevant under the discussion of
whether Plaintiff Goodrich had sufficient knowledge to have
exhausted administratively his complaint that he was not given
first choice to move additional cattle onto his Whitetail
Allotment in the Little Belt Mountains.  The FEIS specifically
identifies the name of the individual who would be permitted to
move cattle onto the Whitetail Allotment: Alternatives 1, 3-4A,
and 6-10 each specify "Kennedy (108 AUMs) moved to Little Belt
Mountains."  (FEIS II-11-31, Table II-2, -4a, -5a, -6a, -8a, -9a,
-10a, -11a, fn.1.)  Because Alternative 10 was chosen, and
because Alternative 10 specifies that Joseph Kennedy would be
permitted to move cattle onto the Whitetail Allotment, Plaintiff
Goodrich is imputed with the knowledge of that fact.

grazing allotments.  (Second Amended Compl. ¶16.)  Plaintiff John Grande holds a grazing permit on the Slaughterhouse Allotment. (Second Amended Compl. ¶ 20.)

The Forest Service estimates that implementation of Alternative 10 results in an approximately 2% reduction in herd size (a reduction of 8 head out of 380 cattle total) for Plaintiff Goodrich and an approximately 6% reduction in herd size (a reduction of 24 head out of 400 cattle total) for Plaintiff Grande, noting that both Plaintiffs can maintain their herd size by grazing those cattle moved off of the public land allotment on their private land or by leasing other private land for grazing purposes.  (AR A-51 at 14.)  Although the FEIS Alternative 10 predicted allowing 8,996 AUMs on the Castle Mountains allotments (down from 12,805 AUMs), the actual number varies from year to year.  Under Alternative 10, the actual use of the allotments is dependent upon continued monitoring of the allotments, with the proviso that reductions or increases in AUMs follow from deterioration or improvements of the pastures and other key areas.  (FEIS II-30; AR A-51 at 18.)

The annual reevaluation of AUMs is consistent with the term grazing permits held by the Plaintiffs because the permits themselves provide that the "permit can also be cancelled, in whole or in part, *or otherwise modified*, at any time during the term *to conform with needed changes* brought about by law, regulation, Executive order, *allotment management plans, land management planning, numbers permitted or seasons of use necessary because of resource conditions*, or the lands described otherwise being unavailable for grazing."  (AR R-380 at 1 (Goodrich Term Grazing Permit), R-495 at 1 (Grande Term Grazing Permit) (emphasis added).)


II.   Legal Standards.

     A.   For Summary Judgment Generally.   Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  To withstand a motion

10

for summary judgment, the nonmoving party must show "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

     B.  For Review Pursuant to the Administrative Procedures Act. Under section 706 of the Administrative Procedures Act, a court reviewing an administrative decision must decide whether the agency decision is "arbitrary, capricious, an abuse of agency discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy, 898 F.2d 1410, 1414 (9th Cir. 1990). The focus of the arbitrary and capricious test is on the agency's fact-finding, and particularly on whether the agency has established a rational explanation for the facts found and the decision based on those facts. Id. The reviewing court must not substitute its judgment for that of the agency. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Unless the decision is not based on the relevant factors or there is a clear error of judgment, the agency decision passes the arbitrary and capricious

test, and the reviewing court may not overturn the agency's

decision.  <u>Amer. Hosp. Ass'n v. NLRB</u>, 499 U.S. 606 (1991).  The

reviewing court must confine itself to consideration of the

agency's reasons contained in the administrative record.  <u>See</u>

<u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973).

C.   <u>Review Pursuant to NEPA</u>.

     Defendants outline the purpose of the National Environmental

Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, et seq., as

follows:

> NEPA was enacted to "encourage productive and enjoyable
> harmony between man and his environment; to promote
> efforts which will prevent or eliminate damage to the
> environment and biosphere and stimulate the health and
> welfare of man; [and] to enrich the understanding of
> the ecological systems and natural resources important
> to the Nation."  NEPA, § 2, 42 U.S.C. § 4231.  "NEPA
> requires the federal government to issue an
> environmental impact statement before taking 'any major
> Federal actions significantly affecting the quality of
> the human environment....' 42 U.S.C. § 4332(2)(C)."
> *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th
> Cir. 2004).  NEPA's mandate to the agencies is
> "essentially procedural . . .  It is to insure a fully
> informed and well-considered decision..." *Vermont*
> *Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558
> (1978).  NEPA does not dictate any result, it merely
> requires that the agency undertake a certain process.
> *Inland Empire Public Lands Council v. U.S. Forest*

*Service*, 88 F.3d 754, 758 (9th Cir. 1996).

Defs.' Summ. Judg. Brief (Docket #53) at 7-8.


III. <u>Failure to Show Prudential Standing.</u>

Prudential standing requirements consist of "several judicial self-imposed limits on the exercise of federal jurisdiction." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996).  The main inquiry is whether "a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit." *City of Sausalito*, 386 F.3d at 1199.  Plaintiffs' Second Amended Complaint makes numerous claims pursuant to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, et seq.

Plaintiffs bring these NEPA claims pursuant to the judicial review provision of the APA.  5 U.S.C. § 702.[4]  "The Supreme

---

[4]  Section 702 provides that a person "adversely affected or aggrieved by agency action within the meaning of the relevant statute" may seek judicial review of the agency action.

Court has interpreted this section of the APA as imposing a prudential standing requirement that 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute ... in question.'" *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 939-40 (9th Cir. 2005) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).  The full prudential standing test calls for a plaintiff to allege both that the agency action has caused him an "injury in fact" and also that his injury is "arguably within the zone of interests" of the statute violated.  *See Data Processing*, 397 U.S. at 153; *Barlow v. Collins*, 397 U.S. 159, 90 S. Ct. 832, 25 L.Ed.2d 192 (1970); *Sierra Club v. Morton*, 405 U.S. 727, 732-33, 92 S. Ct. 1361, 31 L.Ed.2d 636 (1972).

        The zone of interests prong of the prudential standing test requires Plaintiffs to show that the interest they seek to protect is "arguably within the 'zone of interests' to be protected or regulated by the statute in question."  *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395, 107 S.Ct. 705, 93

14

L.Ed.2d 747, 755 (1987) (quoting *Data Processing, 397 U.S. at
153)*.  The statute in question in this case is NEPA, and it is
clear that economic injury alone will not suffice to state an
injury within the zone of interests of NEPA.  *See Nevada Land
Action Ass'n v. United States Forest Serv.*, 8 F.3d 713, 716 (9th
Cir. 1993) ("The purpose of NEPA is to protect the environment,
not the economic interests of those adversely affected by agency
decisions."); *Port of Astoria v. Hodel*, 595 F.2d 467, 475 (9th
Cir. 1979) (purely financial interests are outside of NEPA's zone
of interests); *Rancher's Cattleman v. United States Dep't of
Agric.*, 415 F.3d 1078, 1102 (9th Cir. 2005) (an economic injury
alone will not support a claim under NEPA); *Western Radio Servs.
Co. V. Espy*, 79 F.3d 896, 903 (9th Cir. 1996) (holding that a
plaintiff whose only complaint was that agency action would cause
economic harm asserted an interest outside NEPA's zone of
interests).  Thus, prudential standing requirements in a NEPA
case require a plaintiff to allege an environmental injury, not
an economic injury.

　　　Plaintiffs' Second Amended Complaint states an economic

injury.  Their complaint asserts that the various failures of the
U.S. Forest Service have "already resulted in a reduction in the
economic viability of the ranching operations involved."  (Second
Amended Compl. ¶ 3.)  Plaintiffs seek a declaration that the
Forest Service "must comply with their own rules, regulation and
requirements" ... "in making decisions impacting the livelihoods
of those ranchers who depend upon the use of the federal lands."
(Second Amended Compl. ¶ 5.)  Plaintiffs assert that "[t]he
economic viability, market value, and the operational integrity
of the Plaintiff's ranch depends upon the regular use of his
grazing allotments."  (Second Amended Compl. ¶¶ 16, 22.)

In response to Defendants' prudential standing argument,
Plaintiffs have begun to translate their economic injuries as
stated in their Complaint into environmental "interests."  To do
this, Plaintiffs have begun to focus on how the lack of a proper
NEPA procedure has yielded range data that does not help them in
their ranching business:

> We do have economic concerns about the Castle Mountain
> FEIS and how the non-scientific reductions in animal
> unit months will affect us.  However, our concerns go

16

far beyond economic.  How can we manage for improvement
of the range resource if we do not have an accurate
assessment of the current condition?  How do we know if
management changes are needed if we have no trend
measurements to tell us whether the resource is
improving or degrading under current management?

(Pls' Brief on Supp. Auth. at 2-3, quoting John Grade Decl. at

¶8.)  However, these environmental interests are simply economic

interests with an environmental focus.  Plaintiffs cannot show

prudential standing simply by showing that they rely on LCNF

scientific data to run their business and that therefore they

should be allowed to sue the LCNF when it provides what

Plaintiffs deem to be flawed or inadequate data.  The answer to

that would be for Plaintiffs to hire their own scientists to help

them run their businesses.  These so-called environmental

interests are simply thinly-veiled economic interests.

But Plaintiffs attempt to rephrase their interest again, by

also stating that

Plaintiffs in this case have economic injuries that are
intertwined with *environmental injuries*.  In addition,
both Plaintiffs have asserted that they are deeply
interested in protecting the environment, both to
sustain the long-term productivity of the land and to
protect the health of Montana's grazing lands.

17

(Pls' Brief on Suppl. Auth. at 6; emphasis added.)  Plaintiffs still do not explain what the environmental injury is.  Feelings such as 'deep interest in protecting the environment' do not provide prudential standing.  An interest in sustaining the long-term productivity of the land is an economic interest.  Likewise, an interest in protecting the health of Montana's grazing land (as opposed to an interest in protecting the environment where grazing occurs) is an economic interest.  Nowhere do Plaintiffs assert any environmental injury.

Plaintiffs also attempt to evade the actual injury requirement of prudential standing by asserting that their interests are intertwined with environmental interests.  (Pls' Brief on Supp. Auth. at 7.)  Plaintiffs' legal argument can be traced back to *Port of Astoria*, wherein a plaintiff with economic injuries was found to have prudential standing because its economic injuries were intertwined with environmental interests.

In *Port of Astoria*, however, despite the oft-quoted language about 'intertwined environmental interests,' the environmental *interest* was actually an environmental *injury*.  The issue in that

case was whether an environmental impact statement had to be
prepared in connection with the construction of a proposed
aluminum reduction plant (the "Alumax plant"), or, more
precisely, in connection with the Bonneville Power
Administration's decision to execute a power supply contract to
supply electricity to the Alumax Pacific Corporation, which
proposed to build the aluminum reduction plant.  The suit was
brought under NEPA by the Port of Astoria (an Oregon municipality
and port district), an unincorporated citizens group, and the
corporate owners of a radio broadcast facility.  The question of
prudential standing arose as to each of the three plaintiffs.

     The Port of Astoria is a port district located in Clatsop
County.  At one point, the Alumax plant was to be built in
Clatsop County, but later the site was changed to Umatilla
County.  The Port of Astoria sued the BPA and the Alumax Pacific
Corporation because moving the plant to Umatilla County would
cause the port district to suffer a loss of its potential tax
base, potential revenue, loss of a new dock facility, and
approximately $250,000 in its out-of-pocket expenses.  595 F.2d

at 474.  The Port of Astoria was found to lack prudential standing because its economic interests failed the zone of interest test.  *Id.*

Next, the Concerned Citizens of Clatsop County alleged ecological and aesthetic injuries resulting from the construction of the Alumax plant: "they have alleged that the plant will cause a diminution in Umatilla County's existing water supply, an increase in the deposit of solid wastes, [and] the emission of fluorides and other pollutants into the air and the Columbia River...."  *Id.* at 476.  This alleged injury was determined to be within the zone of interests of NEPA, and the Concerns Citizens of Clatsop County were found to have prudential standing to sue under NEPA.  *Id.*

The third plaintiff in the case, Hermiston Broadcasting Company, owned and operated radio broadcast facilities in Umatilla County.  Hermiston Broadcasting alleged that the high-voltage transmission lines that would serve the Alumax plant would interfere with its broadcasts.  *Id.*  The panel did not decide whether the injury was economic (saying that it "may be .

. . economic"), but the panel determined that prudential standing was established because "the injury is the immediate and direct result of the building of the Alumax plant, an action that 'will have a primary impact on the natural environment.'" Significantly, the panel identified Hermiston as having a common interest with NEPA and with the Concerned Citizens in the proposed construction of the Alumax plant.  "Moreover, Hermiston's injuries, unlike the Port of Astoria's economic injuries, are causally related to an act that lies within NEPA's embrace."  *Id.* at 476.  The "act within NEPA's embrace" was the building of an aluminum reduction plant that allegedly would injure the environment by diminishing the existing water supply, increasing deposits of solid wastes, and emitting fluorides and other pollutants into the air and the Columbia River. Hermiston's injury itself resulted from, at least arguably, a potential pollution emanating from high-voltage electrical transmission lines.  From either perspective (the direct environmental pollution caused by the Alumax plant or the indirect environmental pollution from the high-voltage power

21

lines serving the Alumax plant), Hermiston's injury was intertwined with allegations of an environmental injury.[5]

Such is not the case here.  Plaintiffs' economic injuries float freely, untethered to any allegations of environmental injury.[6]  Standing is absent under NEPA when a plaintiff merely alleges an economic injury intertwined with a deep love for the environment or even intertwined with a business that relies on the environment in some peculiar fashion.[7]  The "act within

_____

[5]  Compare Hermiston's injury to the economic injury asserted by the port district:  The port district had no concern about environmental injuries caused by the plant--in fact the port district welcomed the plant.  This is why the port's economic injury was not viewed by the panel as being coupled with an environmental interest within NEPA's embrace.  Similarly here, the Plaintiffs have no concern about environmental injuries caused by grazing.  They welcome grazing, and their concerns are purely economic.

[6]  In fact, the Forest Service's statistics show that the Castle Mountains project area has improved.  (Def.'s SUF ¶88; AR A-51 at 16.)

[7]  For instance, Hermiston's business relied peculiarly on the environment, because its broadcasts were distributed via airwaves, and those airwaves would be impaired by the high transmission electrical lines serving the Alumax plant. Significantly, however, this was only an economic injury, and not a matter within NEPA's embrace.  Only the allegations of economic injury *coupled with true environmental injuries* (both injuries

NEPA's embrace" must provide an allegation of environmental injury to satisfy the zone of interests test.   Thus, *Port of Astoria* does not support Plaintiffs' legal argument.   Plaintiffs lack prudential standing to sue under NEPA.


IV.   <u>Failure to Exhaust Administrative Remedies.</u>

The LCNF claims that it had no notice of most of Plaintiffs' claims.   Exhaustion of administrative remedies is a requirement under 7 U.S.C. § 6912(e), which provides

> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary [of the Department of Agriculture] or required by law before the person may bring an action in a court of competent jurisdiction against--
> (1) the Secretary;
> (2) the Department; or
> (3) an agency, office, officer, or employee of the Department.

7 U.S.C. § 6912(e).   Claims exhausted "must be so similar that the district court can ascertain that the agency was on notice

───────────────

being caused by the construction of the Alumax plant) provided a basis for Hermiston's prudential standing.   In our case, the allegations of true environmental injuries are missing.

23

of, and had an opportunity to consider and decide, the same claims now raised in federal court." *Wilderness Society v. Bosworth*, 118 F.Supp.2d 1082, 1099-1100 (D. Mont. 2000).  The Defendants assert that the following claims were not exhausted in Plaintiffs' administrative appeals:

-- that the Forest Service made a "predetermined decision" before undergoing NEPA analysis.
-- that the Forest Service failed to follow the Range Management Handbook.
-- that the Forest Service used an inadequate inventory plot size of 1.4 square feet instead of 4.8 square feet.
-- that the Forest Service conducted a poor soil analysis.
-- that the Forest Service's "utilization standards" in the FEIS violated the Forest Plan.
-- that the Forest Service used incorrect coefficients to calculate elk and livestock AUMs.
-- that the Forest Service's "key area" definition in the FEIS differs from that used by the Society for Range Management and that contained in the Range Management Handbook.
-- that the Forest Service violated FLPMA when it permitted Kennedy to move 108 AUMs to Goodrich's Whitetail Allotment.

The Court has examined these claims and found that they were not exhausted by Plaintiff during the administrative appeals process.  Most of these claims, however, are subpoints within the Plaintiffs' NEPA claims, and they fail in the first instance for

24

lack of prudential standing and only secondarily for failure to exhaust administrative remedies.

This is not the case, however, with the last claim itemized above, which is that the Forest Service violated the Federal Land Management Policy Act (FLPMA), 43 U.S.C. § 1752©, when it permitted Kennedy to move 108 AUMs to Goodrich's Whitetail Allotment.  This code section provides that when a grazing permit expires, the holder is to be given first priority for receipt of the new permit (as long as the prior holder of the permit is in compliance with all regulations and terms).  Here, at a point mid-term of Plaintiff Goodrich's permit, the Forest Service granted another permittee (Kennedy) the right to move 108 AUMs to the Whitetail Allotment where Goodrich held a grazing permit. Goodrich did not lose any AUMs.  The operation of Goodrich's permit remained the same.  (AR R-203 at 12.)  Clearly, the statute does not require the Forest Service to offer any additional AUMs to an existing permit holder, and this claim is without merit.  But just as clearly, Plaintiff Goodrich did not exhaust this issue during his administrative appeal (*see* AR P-1),

25

and he should have done so because the FEIS was quite clear that permittee Kennedy would be offered additional AUMs on the Whitetail Allotment where Goodrich already had a grazing permit. (*See supra*, fn. 3.)


V.   <u>Merits of Alleged NEPA Violations.</u>

_____Even if Plaintiffs were able to establish standing and exhaustion, the Court notes in passing that their claims would fail on the merits.

_____Essentially, Plaintiffs challenge the methods used by the LCNF to survey and analyze its grazing allotments in the Castle Mountains project area.  Plaintiffs prefer what is known as a "Parker three-step method", which was used to survey only 4 of the 15 grazing allotments, in 1950, 1956, 1964, and 1974.  (AR V-43.)  Plaintiffs' preferred method is one that focuses on the quality of range for grazing purposes.  The LCNF decided to break with the Parker three-step method, not just because the data was

old and of low quality[8] for LCNF's purposes, but also because the
data was designed to provide information about the quality of the
allotments for livestock grazing purposes.  "The focus changed to
look at the Potential Natural Community (desired plant
communities dominated by native plant species) in determining
condition (ecological status) *rather than looking at only those
species that are good for range (livestock) production*." (Rash
Decl. ¶14; emphasis added.)  Instead, the LCNF wanted to know
about the complete ecological status of the allotments, not only
for grazing purposes, but for many other purposes as well: for
the purposes of promoting natural plant communities, improving
riparian areas, and improving wildlife habitat, big game forage,
and fish habitat (especially that of the westslope cutthroat
trout).  (ROD at 2.)  In other words, the two methodologies are
apples and oranges.  Plaintiffs favored the apples.  The LCNF

---

[8] "Permanent benchmark trend data (Parker 3-step transects)
was not reread in the 1991 inventory because a) the method of
analysis changed (lack of compatibility, b) insufficient number
of transects [in the Parker 3-step method] and, c) inadequate
location of transacts (A.R. Doc. A-3 at 107 at b.; A.R. Doc. A-51
at 7-8)."  (Rash Decl. ¶13.)

favored the oranges.

The methodology chosen by the LCNF for preparation of its
EIS was the ECODATA survey method.  The ECODATA sampling method
is set forth in the Forest Service Handbook [2090.11] "Ecosystem
Classification Handbook" (12/87).  (AR R-1 Supp.; Ex. 1 to Rash
Decl.)  (See Docket #61 Order.)  It is Forest Service policy to
conduct inventories using the ECODATA method to produce
standardized ecosystem information.  (Rash Decl. ¶7.)

Plaintiffs argue that the LCNF should have used Plaintiffs'
preferred methodology, which is the Parker three-step transect
method, when gathering data upon which to prepare the DEIS.
Plaintiffs cite *Ecology Center, Inc. V. Austin*, 2005 WL 3312767
(9th Cir. 2005), for the proposition that an "agency is not
permitted to adopt and rely upon a methodology without reasonably
verifying its reliability."  *Id*. at 7-8 fn. 13.  In *Ecology
Center*, the panel found that the Forest Service was arbitrary and
capricious when it utilized a theory that it had not tested with
any actual data or "on the ground analysis."  *Id*. at 3.
Plaintiffs assert that the ECODATA sampling system is an untested

28

hypothesis and the decision to use it was an unreasonable break
with the past technique, resulting in an action both arbitrary
and capricious.

However, the Forest Service correctly responds that its
ECODATA sampling system is not a hypothesis at all, but simply a
system of collecting data (about one thousand pages of data)
built upon visual observation.  There is no scientific hypothesis
suitable for testing here, and there is no lack of actual data or
on-the-ground analysis.  The ECODATA sampling system has been in
use in National Forests for more than a decade.  (AR V-7 at 42-
45.)

Moreover, the proof is in the pudding.  The Forest Service
has now implemented all pasture alignments.  (AR A-51 at 15.)
Six miles of conventional fence and nearly ten miles of electric
fence have been built to make possible a rest rotation system on
pastures that have been overgrazed.  *Id.*  New fencing has also
protected numerous riparian areas that were degrading.  *Id.*  Six
springs have been developed, 25 stock watering tanks put into
operation, and 10.6 miles of water pipelines, along with 4

generator pumps, 4 storage tanks, and 1 storage pond, and all
these improvements have helped to distribute cattle more evenly
throughout the suitable grazing land and, thus, to discourage
overutilization of pastures near riparian areas and the riparian
areas themselves.  (FEIS at II-32.)  The Forest Service reports
that in the seven years since Alternative 10 was chosen by the
Record of Decision, the Castle Range Mountains project area has
improved significantly:  "These protected riparian areas have
shown dramatic improvement in condition in the last five to seven
years.  The rest rotation systems have provided the rest
necessary to reduce damage to vegetation under the excessively
high utilization that occurred on the Flagstaff and
Slaughterhouse allotments during 2000 and 2001.  The six spring
developments and 11 water pipelines with 25 tanks have
successfully improved cattle distribution."  (Def.'s SUF ¶88
(internal citations omitted); AR A-51 at 16.)

The Court can see no procedural impropriety under NEPA, and
the results of the Castle Mountains Range project appear to be
favorable to the environment.  The Court finds Plaintiffs' NEPA

claims to be without merit.  The Court particularly finds
Plaintiffs' proposed facts in support of their various NEPA
claims to be inaccurate at best and plainly false on occasion.[9]


VI.   Other Pending Motions.

Finally, there are numerous minor pending motions yet to be
addressed.  Plaintiffs' request for a site visit is inappropriate
in an administrative review case.  There is a battle of the
experts underlying the parties' cross-motions to strike the
opposing expert's declaration.  The Court finds that Defendants'
Motion to Strike Declaration of John Lacey, PhD, is well taken
because the 2005 Lacey Declaration is an inappropriate extra-
record and post-decision supplementation.  On the other hand, the
Declaration of Eldon Rash is properly part of the administrative
record, because he directed and conducted the EIS analysis, and
he is a percipient and expert witness who is able (1) to explain
the rationale for the scientific method used by the Forest

---

[9]   The Court finds the majority of Plaintiffs' Statement of
Uncontroverted Facts to be unfounded and rejects the same.

Service, (2) to assist the Court in determining whether the Forest Service has considered all relevant factors and adequately explained its decision, and (3) to aid the Court by explaining numerous technical matters underlying the EIS.  The Forest Service Handbooks are the pre-decisional handbooks underlying the EIS and are appropriately made part of the record.

Plaintiffs' request to make Rod Cole's Second Declaration part of the record is to be denied as untimely, as the request comes after evidence closed on the summary judgment motions. Plaintiffs brought additional prudential standing cases to the attention of the Court at the time of the summary judgment hearing, and the Court permitted the parties to submit post-hearing briefs on the application of the additional prudential standing cases to the instant case.  Apparently Plaintiffs realized that they did not have the precise facts in evidence to make those cases applicable to them, so Plaintiffs attempted to submit the Second Declaration of Rod Cole along with their supplemental brief on the case law.  The Second Declaration would not make the difference in the case-this Court would not change

its opinion or judgment in any respect even were the Second
Declaration properly in evidence–but the procedure of requiring
the parties to marshal their facts prior to the conclusion of the
summary judgment hearing is worth maintaining.  *See* Local Rule
56.1(d) ("Parties shall file no further factual materials except
with leave of the Court upon a showing that factual materials
were reasonably omitted in the Statement of Uncontroverted Facts
and Statement of Genuine Issues.").

In this case, it appears to this Court that Plaintiffs
attempted to surprise Defendants at the summary judgment hearing
with two 'new' cases (over three months old at the time of the
hearing) that purportedly supported Plaintiffs' prudential
standing, but then Plaintiffs discovered in post-hearing briefing
that they did not have sufficient facts in evidence to make the
legal argument applicable, hence the filing of the Second
Declaration with the supplemental brief.  Beyond the fact that
the Second Declaration is insufficient to show prudential
standing, it should be stricken simply to enforce a modicum of
fairness in this summary judgment proceeding.

33

VII. <u>Conclusion.</u>

The Court finds that there are no genuine issues of material fact to be tried and that Plaintiffs have failed to show that they possess prudential standing to bring the Second Amended Complaint in that they fail to show an injury within the zone of interests of NEPA.  On the merits, the Court finds further that Plaintiffs have failed to show that the Federal Defendants' actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  Finally, the Court finds that many, if not most, of Plaintiffs allegations have not been exhausted (as itemized above), including Plaintiffs' FLPMA claim relating to Kennedy's 108 AUMs that were moved to the Whitetail Allotment.

Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment (Docket #42) is DENIED.

IT IS FURTHER ORDERED that the Federal Defendants' Motion for Summary Judgment (Docket #53) is GRANTED.  The Second Amended

34

Complaint is DISMISSED.  All relief is denied Plaintiffs.

        IT IS FURTHER ORDERED:

        1.  Defendants' Motion to Strike (Docket #97) is GRANTED:
Plaintiffs' Second Declaration of Rod Cole (Docket #94) is
STRICKEN.  All factual allegations in Plaintiffs' Supplemental
Brief (Docket #94) based upon the Second Declaration of Rod Cole
are also stricken.
        2.  Plaintiffs' Alternative Request for Leave to File Rod
Cole's Second Declaration (Docket #100) is DENIED.
        3.  Plaintiffs' Motion for Order Seeking [Rule 54(b)]
Separate Judgment (Docket #91) is DENIED as moot.
        4.  Defendants' Motion to Strike Declaration of John Lacey,
PhD, (Docket #57) is GRANTED.  Plaintiffs' Motion to Strike
Declaration of Eldon Rash and Certain Forest Service Handbooks
(Docket #71) is DENIED.
        5.  Plaintiffs' Motion for a Site Visit (Docket #79) is
DENIED.
        6.  Defendants' Motion to Require Compliance With Rule 5
(Docket #86) is DENIED as moot.

        Let judgment enter in CV 03-22-H-CCL and CV 03-23-H-CCL.

        The Clerk is directed to notify the parties of entry of this

order.

        DATED this 28th day of February, 2006.


                    _____
                         CHARLES C. LOVELL
                    SENIOR UNITED STATES DISTRICT JUDGE


                                35